PERKINS, ESTATE OF, In Re

Ohio Probate Court, Cuyahoga Co

No 249104. Decided Sept 21, 1938

David K. Larrimer, for Tax Commission.

E. D. McCurdy, Cleveland, of Boyd, Brooks & Wickham, Cleveland, for James C. Brooks and James C. Brooks, Jr., exceptors.

John W. Scott, Cleveland, for all other exceptors.

## OPINION

By BREWER, J.

This cause was heard on the exceptions of Ralph Perkins, J. Alex Sullivan and A. E McDaniel, executors of the will of Jacob B. Perkins, deceased, and also on exceptions of various persons, beneficiaries of gifts by said decedent during his lifetime, to the assessment of the, inheritance taxes assessed in said estate.

Jacob B. Perkins died testate on the 26th day of December, 1936; his will was admitted to probate on January 15th, 1937, and Ralph Perkins, J. Alex Sullivan and A. E. McDaniel were appointed as executors thereof. Jacob B. Perkins during his lifetime was the maker of many gifts. He made gifts to his son, Ralph Perkins, in 1919, 1922, 1926 and 1932. He made gifts to James C. Brooks, Jr., a grandson in 1926, 1932, 1935 and 1936. He made gifts to Katherine H. Perkins, daughter-in-law, in 1932. He made a gift to Mrs. A. E. Peterson, wife of an old employee in 1934. In 1935 and 1936 he made gifts to Mrs. Elizabeth P. Miller, granddaughter. In 1935 and 1936 he also made gifts to Jacob B. Perkins II and Ralph Perkins, Jr., grandsons, and to Gertrude Perkins, granddaughter, Leigh H. Perkins, grandson, James C. Brooks, son-in-law, and to J. Alex Sullivan, an employee not related to Ruth Sullivan, wife of J. Alex Sullivan, not related, and in 1935 to A. C. McDaniel, a business associate. These successions of these gifts were taxed as testamentary dispositions and to this assessment exceptions were filed. These gifts will subsequently be described in detail and their nature and taxability fully discussed. Exceptions were also taken to the valuation placed on certain assets belonging to the estate for purposes of inheritance tax.

The Tax Commission at the opening of the trial in order to sustain its burden of proof that gifts made more than two years prior to the death of Mr. Perkins which occurred as aforesaid, December 26th, 1936, were made in contemplation of death, offered in evidence the application of the executors for determination of the inheritance tax, the journal entry containing the findings of the court to the effect that the aforesaid gifts were made as distribution in contemplation of death and the last will and testament of the deceased, and rested. Thereupon a motion was made on behalf of exceptors that the exceptions insofar as they pertain to the gifts made prior to 1935, be sustained, for the reason that the only evidence before the court as to whether or not the gifts were made in contemplation of death, was the sworn statements of the executors as set forth in the application to determine the inheritance tax.

It was argued on behalf of the Tax Commission that the statements of the executors duly sworn to, which were introduced in evidence, were contained in the application to determine the inheritance tax which was filed in conformity to the statute, stating that certain transfers and gifts of prop-

erty were made by the decedent at certain times prior to his death. The question arising out of this controversy seems to be this; The burden of proof being on the Tax Commission, if submitted the only evidence it had at that time. Any further evidence that might be submitted by the Tax Commission, by reason of the peculiar circumstances of the case. could be adduced only by cross examination of the witnesses offered by the exceptors. In cases of this kind, excepting the documentary evidence, the Tax Commission generally has no means other than cross examination of the exceptor's witnesses, of securing the evidence essential to the proving of its case. The evidence in **Tax Commission v Parker, 117 Oh St 215** and in the case of **"In Re, Estate of Warren S. Hayden," 5 Ohio Opinions 317**, and in fact, generally speaking, the evidence in all cases of this kind which have been reported in Ohio, was secured in this manner.

The contention of the executors that the matter introduced in evidence by the Tax Commission shows on its face that the motive of the testator in making the gifts was not one of distribution, seems to be a conclusion not justified by the facts. In cases like the one before the court the documentary evidence is usually sufficient to establish a prima facie case. The case of Warren S. Hayden heretofore cited, is one of this type. Warren S. Hayden executed a series of wills with codicils thereto and also made a number of gifts to his children by means of trust agreements executed during the period of ten to twelve years before his death. These gifts were held to be testamentary dispositions, and therefore taxable. During the time extending from 1919 to 1936—seventeen years, Mr. Perkins made approximately thirty gifts mostly to his natural heirs, amounting in value to more than $700,000.00; and when he died he left an estate which he disposed of by will of less than $300,000.00. Of this circumstance, it may be said that there is a grave suspicion that at least some of these gifts were testamentary dispositions; and that this cause was instituted for the purpose of determining tha fact.

In view of the fact that neither party to the controversy could offer any authority in support of his contention, the court desires to make a brief statement of the law as he sees it, in respect to the burden of proof, as it seems to apply to this case.

Under the rules of evidence in common practice the burden of proof fixes on the party who has it, the duty of first going forward with the case. If he fails to introduce any evidence at all, or if he had failed to introduce sufficient evidence to justify a submission of the case to the jury, the case without evidence being introduced by the other party, must go against him. If, however, the party on whom the burden rests has introduced enough evidence to justify a submission of the case to the jury, the case may still be, as it were, hanging in the balance. The jury may or may not find from the evidence introduced that he has proved his case. But, if the party who carries the burden as introduced sufficient evidence to make a "prima facie" case, then in the absence of evidence to controvert such case, the jury would be bound to find—(for the court would so instruct) in his favor. When the plaintiff has introduced enough evidence to make out a prima facie case, the defendant unless he would see the verdict go to the plaintiff must take up the case and introduce evidence to controvert or weaken the effect of that which the plaintiff has introduced. This is the burden of going forward with the evidence, or the "burden of proceeding," as it is called to distinguish it from the "burden of proof."

In the course of trial, the burden of proceeding may shift from one party to another; but the burden of proof remains on the shoulders of the party who had it at the outset. Heinneman v Heard, 62 N. Y. 488.

The law of Ohio bearing on the rule under discussion is comprehensively embodied in one case, **Klunk v The Hocking Valley Ry. Co., 74 Oh St 125.** The facts and the law are both succinctly set forth in the syllabus, which is as follows:

"1. On the trial of an action against a railroad company brought by a locomotive fireman for a personal injury received by him in consequence of a defect in the water guage glass attached to the locomotive upon which he was employed, an instruction, that to overcome the effect of the prima facie evidence of negligence arising from proof of such defect, "the defendant company is required to satisfy the jury by a preponderance of the evidence that it was not negligent", is erroneous.

"2. In such action the burden of proving, by a preponderance of the evidence, the particular negligence alleged is at all times upon the plaintiff, and while proof of facts sufficient under the statute, (§3365-21 GC), to create a prima facie presumption of negligence against the defendant

casts upon it the burden of producing evidence of equal weight or countervailing force, in order to control or destroy such presumption, yet proof of such facts does not impose upon the defendant the burden of establishing affirmatively, by a preponderance of the evidence, that it was not negligent.

"3. The rule is that he who affirms must prove, and when the whole of the evidence upon the issue involved leaves the case in equipoise, the party affirming must fail."

On page 134 the court says:

"It is clearly a misnomer of terms to say that the burden of proof swings like a pendulum from one side to the other during the progress of the trial. All that is meant is that the duty of introducing evidence to meet a prima facie case shifts back and forth."

. On page 135 the court quotes with approval the statement of Chief Justice Shaw in Powers v Russell, 13 Pick. 76 as one of the best and clearest statements of the rule to be found. Chief Justice Shaw said:

"It may be useful to say a word upon the subject of the burden of proof. It was stated here that the plaintiff had made out a prima facie case, and, therefore, the burden of proof was shifted and placed upon the defendant. In a certain sense this is true. Where the party having the burden of proof establishes a prima facie case, and no proof to the contrary is offered, he will prevail. Therefore, the other party, if he would avoid the effect of such prima facie case must produce evidence, of equal or greater weight to balance and control it, or he will fail. Still, the proof upon both sides applies to the affirmative or negative of one and the same issue or proposition of fact; and the party whose case requires the proof of that fact, has all along the burden of proof. It does not shift though the weight in either scale may at times preponderate."

It appears to the court that the Tax Commission on whom the burden of proof was cast had presented suffi- ■■■■ ■ cient evidence to meet the issue and for the time being to satisfy the burden of proof. The burden of proof still remained with the Tax Commission, but the burden of proceeding shifted to the exceptors. Therefore, it is the opinion of the court that the Tax Commission has introduced suffi- ■■■■ ■ cient evidence to make a prima facie case, and that its contention should prevail; and that the motion to sustain the exceptions should, therefore, be overruled. An entry will be made accordingly. And further, supporting this view of the court, there are cases which hold that where the proof of a fact lies particularly within the knowledge of the adverse party, that such party has the burden of disproving the fact alleged. Robinson v Robinson, 51 Ill. App. 317; William v People, 121 Ill. 84; 11 NE 881; Ford v Simmons, 13 La. Ann. 397.

Mr. Perkins as heretofore stated, died on December 26th, 1936. He was eighty-two years of age. The gifts that were taxed were made during the years extending from 1919 to 1935 inclusive. There is no evidence indicating that Mr. Perkins during the time heretofore mentioned suffered from any organic disease or serious illness, other than from some sort of gland trouble for which he underwent an operation in 1932, and from which he subsequently recovered.

Mr. Perkins' estate at the time he began making the transfers in question consisted very largely of real property and a manufacturing business. His real property holdings were quite extensive and included offices and factory buildings and vacant lands. In October, 1919, Mr. Perkins gave his son, Ralph Perkins, 125 shares of stock in the manufacturing business then known as The Hill Clutch Company, which stock was subsequently by reason of a re-organization of the company, converted into 375 shares of preferred, 625 shares of second preferred and 375 shares of the common stock of the corporation. This gift was made, according to the testimony of the son who received the stock, in consideration of his taking the position of executive vice-president of the company and devoting his entire time to the job. Said stock was appraised for purposes of the inheritance tax in the sum of $69,125.00.

On December 31st, 1922 Mr. Perkins conveyed to his son, Ralph Perkins, a parcel of real property located at 321 St. Clair Avenue, Cleveland, Ohio, and known as the Kingsley Building. The testimony in reference to this gift was to the effect that the situation in regard to the real property holdings of Mr. Perkins was not satisfactory. This fact being particularly true of the down town properties. The son first acted only in an advisory capacity, but subsequently at the request of his father he took a leave of absence from The Hill Clutch Company for the purpose of de-

voting all of his time to his father's real property affairs. At the end of three or four years this job being finished, Mr. Perkins said to his son: "Well now, I am going to end this. In reward for what you have done and the leases you have made I am going to give you the Kingsley Building and you can go back to the Hill Clutch Company."

In 1926 Mr. Perkins made a gift of $120,000.00 in cash to his son and a gift of $60,000.00 in cash to his grandson James C. Brooks. The testimony in regard to this gift shows that Mr. Perkins owned 450 acres of land southwest of the City of Cleveland which was sold to the City of Cleveland for use in building a municipal airport; that the negotiations for the sale were carried on by the son, Ralph Perkins, and covered a period of about a year; that during the period of negotiations Mr. Perkins, Sr., was very apprehensive as to the consummation of the sale and was much pleased at the outcome. The testimony further shows that Mr. Ralph Perkins, the son, was engaged to be married and that the home of the prospective bride was in Thomasville, Georgia, and that for this reason the son was desirous of buying property in that city for the purpose of making a winter home there for his bride. Mr. Perkins thereupon gave his son the sum of $120,000.00 as a wedding present. The son on receipt of this gift pointed out to his father that such a large gift to him was not entirely fair to his other heir, James C. Brooks, Jr., the child of a deceased daughter. Shortly after this conversation Mr. Perkins gave to his grandson the sum of $60,000.00.

In May, 1932, Mr. Perkins gave to his son, Ralph Perkins, 700 shares first preferred, 1250 shares of second preferred and 750 shares of the common stock of The Hill Clutch Machine & Foundry Company, this stock being valued as follows: First preferred at $70,000.00, the second preferred at $31,250.00 and the common at $750.00, making the total value of the three gifts $102,000.00.

At the same time that Mr. Perkins made these gifts to his son he also gave to his grandson, James C. Brooks, Jr., gifts of the same stocks in the following amounts: First preferred, 375 shares valued at $37,500.00, second preferred 625 shares valued at $15,625.00 and 375 shares of common valued at $375.00, the total value of the three gifts being $53,500.00.

The circumstances in respect to said gifts as brought out in the testimony are as follows: Ralph Perkins, the son, after settling his father's real property affairs in 1925 or 1926 returned to the Hill Clutch Company in the capacity of executive vice-president or general manager, in which capacity he served from 1919 to 1931, excepting however the time he was absent from the job to settle his father's real property affairs. The Hill Clutch Company was engaged in the manufacture of mechanical transmission machinery. In 1926, on account of the rapid increase in the use of the electric drive, the demand for mechanical transmissions began to decline at an alarming rate, and because the company could no longer compete successfully with the electric drive, it became necessary for it either to go out of business or to produce a new product. At this time Mr. Perkins had ceased to take any active part in the business. The son effected a plan whereby the Hill Clutch Company bought out a company that had a product and moved it into the plant of The Hill Clutch Company, and then merged with another concern that had a growing business but was short of manufacturing facilities. This re-organization of the business of The Hill Clutch Company was effected in 1931, and was regarded by Mr. Perkins with much satisfaction. The fact, however, that Mr. Perkins through his large holding of stock did or could control the new company impelled the new business partners, particularly the new manager, Mr. McDaniel, to suggest to Mr. Perkins that it would be desirable to place his stock in the hands of persons who would take a more active interest in the business. In 1932 after consideration of this situation Mr. Perkins transferred to his son 750 shares of the first preferred, 50 shares of which however, were put into the name of Katherine Perkins, the wife of the son, 1250 shares of the second preferred and 750 shares of the common stock, and at the same time he gave to James C. Brooks, Jr., 375 shares of the first preferred, 625 shares of the second preferred and 375 shares of the common stock of said company.

In July, 1932, Mr. Perkins transferred to his daughter-in-law, Katherine Perkins, 340 acres of land near Mentor, Lake County, Ohio, constituting his summer home. The reasons for making this gift are stated to be that in December, 1931, Mrs. Perkins died and that Mr. Perkins did not care to go back there the following summer. His stocks had ceased to pay dividends and there was little return from his real property holdings, the taxes on the Lake County property were delinquent, and the costs of

operating the property was burdensome, costing from four to five hundred dollars a month and that he was not able to bear such expense. A plan was conceived whereby part of the property was abandoned for taxes and the remainder, which included the home in which the decedent's son lived, was conveyed to the daughter-in-law.

In 1934 Mr. Perkins gave to a Mrs. Peterson a house in Lake County, Ohio. Mrs. Peterson's husband had been in the employ of Mr. Perkins since 1898 and had used said house as his summer home; and it was testified that Mr. Perkins gave it to his widow as a reward for the long service of her husband.

Do the transfers of property made by Jacob B. Perkins during the period from October 4, 1919, to the time of his death, December 26th, 1936, constitute gifts made in contemplation of death, as such gifts are defined by the law of Ohio?

Under the Ohio inheritance tax law transfers "in contemplation of death" are taxable. §§5331, 5332 and 5332-2 GC, first define the phrase, "in contemplation of death" and then proceed to levy a tax on all gifts and transfers so made. So much of these sections of the statute as are pertinent to the issue raised in the case at bar are as follows:

"Sec 5331, par. 5 GC.
'Contemplation of death' means that expectation of death which actuates the mind of a person on the execution of his will'."

"Sec 5332 GC—Property on which tax levied.
A tax is hereby levied upon the succession to any property passing, in trust or otherwise, to or for the use of a person, institution or corporation, in the following cases: * * *
3. When the succession is to property from a resident, or to property within this state from a non-resident, by deed, grant, sale, assignment or gift, made without a valuable consideration substantially equivalent in money or money's worth to the full value of such property:
(a) In contemplation of the death of the grantor, vendor, assignor, or donor, or * * *."

"Sec 5332-2 GC.
"Any transfer of property from a resident or of property within this state from a nonresident, if shown to have been made without a valuable consideration substantially equivalent in money or money's worth to the full value of such property, if so

made within two years prior to the death of the transferor, shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this title. * * *"

At the outset reference may be made to the fact that the definition of the phrase "in contemplation of death", as set forth in the Ohio statute, differs from that of most of the other states.

In the State of New York, for example, transfers of property made by a decedent within two years prior to his death without a valid and adequate consideration are presumed to have been made in contemplation of death. The New York courts have defined the term "contemplation of death," to mean, that inducing cause of transfer when death is imminent. This is the usual interpretation of these words "in contemplation of death". Under the federal statute the definition is somewhat broadened. The Supreme Court has held that the words "in contemplation of death" mean that the thought of death is the compelling cause of the transfer, and that while the belief in the imminence of death may afford convincing evidence, the statute is not to be limited, and its purpose thwarted by a rule of construction which, in place of contemplation of death, makes the final criterion to be an appreciation that death is near at hand." U. S. v Wells, 51 Sup. Ct. 446, 72 L. Ed. 592.

The meaning of the phrase "in contemplation of death" as defined by the Ohio statute, and as interpreted by the Supreme Court of Ohio in **Tax Commission v Parker, 117 Oh St 215**, differs in a marked degree from the definition under the Federal statute or the statutes of other states. The rule laid down by the Supreme Court in the Parker case has a bearing in the determination of the case at bar of the greatest importance. This rule is found in paragraph 4, of the syllabus of that case, and is as follows:

"The controlling fact in determining whether a transferor made the transfer of property in contemplation of death is whether the purpose of the transferor was to distribute or partially distribute his estate, or was simply to do an act of generosity or kindness."

It is by application of the statutory definition of the words "in contemplation of death", and the rule laid down in the Parker case that the question as to the

taxability of the transfers of property made by Mr. Perkins during his lifetime is to be determined.

Mr. Perkins died at the age of 82. The first of the long series of gifts in question was made on October 4th, 1919, when he was about 65 years of age, and the others followed with such regularity as to become a habit. Here is the record: One on October 4, 1919; one on December 31, 1922; one on August 21, 1926; three in May, 1932; one in July of 1932; one in 1934; nine in August, 1935; one on November 7, 1935; nine on January 15, 1936.

In 1919 Mr. Perkins proposed to his son Ralph that he go to work for The Hill Clutch Company, which Mr. Perkins owned, declaring as the son testified, that "It was much his desire that I do that; that he considered that I would be of more use to him there than at any other place else, and in consideration of my going there in the capacity of executive vice-president, devoting practically all of my time to it, he would give me 125 shares of the capital stock of the company; and we agreed on that, and I went to work for The Hill Clutch Company."

During this period Mr. Perkins was president of the company, but in 1931, he withdrew from that office and put his son Ralph in his place; and thereupon retired from active participation in the affairs of the company. These events were followed by a merger and a re-organization of the company and another large gift of stock to Ralph. This gift was made in 1932, and it was suggested by Mr. McDaniel, a new business associate who came to the Hill Clutch Company through the merger; and the suggestion was made for the reason that Mr. McDaniel, as the manager of the reorganized company wanted the stock in the hands of a person more active than Mr. Perkins.

The son, not long after accepting the position as executive vice-president of the Hill Clutch Company, at the request of his father took a leave of absence from his new job for the purpose of managing his father's real properties. Up to this time Mr Perkins had been actively engaged in conducting his real estate enterprises. The son in answer to the question as to whether or not his father was actively engaged in the work of looking after his properties, said, "well, I would say he was active, but he turned that job over to me." In 1925, the son, after adjusting his father's real estate affairs returned to his job as executive vice-president of The Hill Clutch Company.

In July, 1935, Mr. Perkins incorporated the Jacob B. Perkins Company, which was capitalized at one thousand shares of no par stock. This company took over the major portion of Mr. Perkins' real properties, more particularly his down town buildings. The Jacob B. Perkins Company began to operate on August 1st, 1935, and on August 20, 1935, Mr. Perkins gave to his grandchildren and others 180 shares of the stock of said company. On November 7th, 1935, he gave 20 shares and on January 15, 1936, 180 shares, a toal of 380 shares about two-fifths of the total issue. James C. Brooks, Sr., the son-in-law of the decedent, testifying in respect to Mr. Perkins reasons for making the gifts of this stock to his grandchildren, said:

"Q. Did he give any reasons for his gifts to the grandchildren, in general?

A. He said he had always wanted to do something for them, but he was never in shape to do it.

Q. Was there a conversation in reference to his position to do it at that time?

A. Well, I don't think he went—of course, he had incorporaated, it was in a company, then, where he could give a few shares of stock as a present when before he couldn't, he hadn't the cash, and he couldn't divide the real estate. The incorporation of the company enabled him to make a gift as he saw fit."

Mr. J. Alex Sullivan one of the executors of Mr. Perkins' will and a business associate, in testifying in regard to the gifts of stock to Mr. Perkins' grandchildren, said,

"Q. Now, in the same year and about the same time Mr. Perkins made gifts of stock to his grandchildren. Did you have any conversation with Mr. Perkins about those—

A. I did.

Q. —gifts?

A. I did.

Q. What was that, please, that conversation, Mr. Sullivan?

A. Mr. Perkins was very interested in having his grandchildren interested in his business. For some years past his cash position had been such that he hadn't been able to give the children presents, we will say, at weddings, Christmas, birthday anniversaries and that, and after the com-

pany was formed he said, "well, now, I can give the children stock where I couldn't give them a piece of a building, but now I can give them some stock and I feel that they will be interested in what we are doing down there."

Considering the facts in their entirety we find a rather singular situation. A man about 65 years of age who was then possessed of an estate of approximately $1,000,-000.00, begins to give away his estate. His first gift is to his son in the sum of $69,-125.00, the second gift is also to his son and amounts to $101,230.00, the third is to his son in the sum of $120,000.00 and at the same time a gift of $60,000.00 is made to his grandson, the only other heir at law. The gifts continue almost until the day of death at the age of eighty-two, and by this time three-fourths of a large estate has been disposed of in this manner. The exceptors contend that these money gifts were not made in contemplation of death but constituted only a bestowal of favors.

The evidence from which the motives of the donor may be inferred are at best meager and unsatisfactory. All the witnesses were recipients of the donor's bounty, and they were exceptors to the determination of the inheritance tax as well. Therefore, in this circumstance, it would seem that their testimony though honestly given must in some degree be considered as being colored by the bias of their own minds.

It is entirely within the range of fact to say that transfers of property are often made by men who desire to retire from active life, and to shift the care and responsibility of their business affairs and the management of their estate to those who are younger and who are the natural objects of their bounty. It is likewise true that gifts are often made in the hope that the donees may escape from the payment of inheritance taxes.

With such evidence as we have before us it is not at all difficult to take the view that during all the time covering the extraordinary series of gifts made by Mr. Perkins he was testamentary minded. His conduct during the entire period evinces a desire to unload his cares and responsibilities. This purpose is evident from the time he gave his son a job at The Hill Clutch Company until his death. The incorporation of his company to take over his real estate is very persuasive of the view that the prime purpose of that transac-

tion was to afford him a means of making gifts and he indeed so expressed himself not only once but several times. The evidence adduced in respect to Mr. Perkins' transfers seemed to point to but one purpose, that is, to put his business affairs in order so that he might retire from active life and dispose of his estate. Mr. Perkins' age is another fact that plays a part in the determination of the motive of the donor. In the estate of **Warren S. Hayden, 5 Ohio Op. page 317,** a case which arose in this court and which in some respects is similar to the case at bar, the court speaking in reference to age as an evidentiary fact to be considered in consideration with other circumstances incident to the case, on page 319, makes this statement:

"It seems fair to conclude that to every person who owns property, especially if it be an estate of considerable value, a time, when the question, "What shall I do with my estate," must, inevitably come. Mr. Hayden had amassed a fortune, which at the time of the execution of his will, according to the testimony of his business partner, amounted to about $2,000,000.00. An estate of such proportions cannot be disposed of without a great deal of thought. Its disposition cannot safely be delayed until its owner is on his deathbed. That Mr. Hayden did give this problem much consideration is evident from the manner in which he disposed of his estate."

The Court of Appeals in **Tax Commission v Seltzer, 41 Oh Ap page 257 declared:**

"When does a man contemplate death? At the age of 79 he must certainly begin at least to contemplate it. In the language of the Psalmist: 'The days of our years are 3-score years and ten; and if by reason of strength they be four score years yet is their strength, labor and sorrow, for it is soon cut off, and we fly away."

Further supporting the fact that the increasing age of a person is evidence to be considered in matters of gifts in contemplation of death is the statement of the Supreme Court of Ohio in **Tax Commission v Parker, 117 Oh St page 222:**

"He, of course, knew at the time of making each of the gifts that he had reached the age when he might expect to die soon." (Mr. Myers, the decedent in the case was 74 at the time of his death)."

Consideration of the advisability, if not the necessity of making provision for the disposal of his estate, was not a new idea to Mr. Perkins when he began making his gifts. He had made a will prior to that time. In this will his wife was the chief beneficiary. She died in 1931. Two or three years later, he made another will, in which his son's children and the only child of a deceased daughter were the beneficiaries and the fact that the testator devised and bequeathed his estate in the proportion of two to the son's children one to the child of the deceased daughter, which ratio is maintained in most of the gifts to the son and the grandson, is not without its significance.

Taking all the facts into consideration, it seems to me there is ample and sufficient evidence to support the inference that in making these gifts Mr. Perkins was impelled by the same motive as actuates the mind of a person on the execution of his will, that the gifts for the most part, were made in contemplation of death. I wish, however, to make some exceptions.

There is some ground for the conclusion that the impelling motive of the first gift of stock to Ralph, the son, in 1919, was generosity rather than testamentary disposition. Ralph was reluctant to accept the job his father offered him—in fact, he had other plans. Mr. Perkins then offered the stock to Ralph as an inducement to take the job. Likewise, it appears from the evidence that the impelling motive of Mr. Perkins' transfer of the Kingsley Building to Ralph in 1922 was in the nature of a reward for services rendered.

I consider the wedding gift to Ralph of $120,000.00, as being in the same category. Wedding gifts for the most part have been regarded by this court as gifts of generosity, and in this case coupled with the idea of the wedding gift was also the motive of a reward for the extraordinary service rendered by Ralph in selling a large tract of land for $450,000.00. Although this gift is, indeed, extraordinary in its amount, in view of the double motive of the donor in making it, and the unusual circumstances which prompted the gift, it is found to be a gift not made in contemplation of death. I am also inclined to regard the gift of the cottage to Mrs. Peterson as an act of generosity in appreciation of the long and faithful service rendered by her husband to Mr. Perkins, and this gift is considered as not having been made in contemplation of death, and is therefore exempt from the inheritance tax.

There is one more of Mr. Perkins' gifts that perhaps deserves to be exempt from the tax. It may be inferred from the evidence that the impelling motive of the gift of the decedent's farm arose from the existence of a financial exigency, which made the cost of maintaining this property an intolerable burden, and that this gift was not associated with the general plan of distribution that Mr. Perkins had in mind. These gifts just mentioned, are, therefore, found to be not liable to the tax.

Exceptions were also filed to the valuation of the stock of The Jacob B. Perkins Company, which was appraised for the purposes of the inheritance tax in the sum of $400.00 per share. The exceptors contend that the fair market value of said stock is $150.00 per share; and the best evidence that was adduced at the trial corroborates this valuation. I am, therefore, satisfied that $150.00 per share is the fair market value of said stock. Hence, this exception should be sustained, and the court will so order.